UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHLEY TECHNER,

        Plaintiff,

                                           Case No. 11-14722

v.                                    Honorable Patrick J. Duggan

HELEN GREENBERG,

        Defendant.

_____/

**<u>BENCH OPINION</u>**

       This case concerns distributions from Greenberg Properties, LLC, to its members,
including the Ashley Greenberg Irrevocable Trust ("Ashley Greenberg Trust") of which
Plaintiff, Ashley Techner (nee Greenberg) ("Ashley" or "Plaintiff")[1], is the sole
beneficiary and current Trustee.  Prior to this lawsuit, Ashley successfully sued Barry
Greenberg ("Barry"), her father and a manager of Greenberg Properties, based *inter alia*
on his distributions from Greenberg Properties in contravention of his fiduciary duties and
the limited liability company's operating agreement.  Here, Ashley is suing her paternal
grandmother and a co-manager of Greenberg Properties, Helen Greenberg ("Helen" or
"Defendant"), claiming that she is jointly liable to the Ashley Greenberg Trust for the
distributions that the trust should have received.

       Ashley has alleged breach of contract and breach of fiduciary duty claims against

---

[1]To avoid confusion, the Court is using first names to refer to the parties and individuals
involved in this lawsuit.

Helen.  On June 26 and 28, 2012, this Court conducted a bench trial with respect to Ashley's claims. The Court now is prepared to rule on those claims.

### Procedural Background

On or about May 16, 2011, Plaintiff filed this action against Defendant in the Circuit Court for Oakland County, Michigan.  Defendant removed the action to federal court based on diversity jurisdiction on October 26, 2011.[2]  In her Complaint, Plaintiff asserts the following claims against Defendant: (1) breach of contract; (II) breach of fiduciary duty under the Michigan Limited Liability Company Act; (III) "equitable estoppel"; and (IV) minority member oppression under the Michigan Limited Liability Company Act.

On February 13, 2012, Defendant filed a motion for summary judgment in which she argued that Plaintiff should be estopped from bringing this action because she received a state court judgment against Barry for the amount of the unpaid distributions from Greenberg Properties– the same unpaid distributions she is seeking to recoup here. Defendant further argued that even if Plaintiff's lawsuit is not barred by the doctrine of estoppel, the applicable limitations periods prevent her from recovering most of the

_____

[2]According to Defendant's notice of removal, she only was served with the Summons and copy of Plaintiff's Complaint via publication on September 29, 2011. (Doc. 1 ¶ 2.)  Plaintiff is a resident of Tennessee.  (Compl. ¶ 1).  Defendant is a citizen of Florida.  (Doc. 1 ¶ 7.)  In her Complaint, Plaintiff alleges that Defendant "failed to make hundreds of thousands of dollars of mandatory distributions to the Trust, excluding interest and income that would have been earned on these distributions, and all of which would have inured to the benefit of Plaintiff as the sole beneficiary of the Trust." (Compl. ¶ 20.)

alleged unpaid distributions and the amount of the distributions that were not properly paid that are timely sought fall below the Court's jurisdictional threshold of $75,000. Defendant argued that the Court therefore lacks subject matter jurisdiction over Plaintiff's Complaint.

On May 16, 2012, this Court issued an opinion and order granting in part and denying in part Defendant's summary judgment motion. (Doc. 20.) As to Defendant's estoppel argument, the Court ruled that Plaintiff may seek the unpaid distributions from Defendant, despite the judgment she obtained to recoup the same unpaid distributions from Barry, because she has not been able to recover the monies from him despite her collection efforts. (*Id*. at 11-12.)

With respect to the statute of limitations issue, the Court held that even if Plaintiff is barred from pursuing recovery of the full amount of the unpaid distributions due to the applicable statutes of limitations, subject matter jurisdiction is not lacking. (*Id*. at 10-11.) The Court further held that neither fraudulent concealment nor the continuing wrong doctrine tolled the limitations periods applicable to Plaintiff's claims. (*Id*. at 5-6.) As such, the Court concluded that, on her breach of contract claim, Plaintiff is barred from recovering damages accruing more than six years before her lawsuit was filed, and more than two or three years prior with respect to her Michigan Limited Liability Corporation Act claims. (*Id*. at 5 (citing Mich. Comp. Laws §§ 600.5807(8), 450.4404(6), and .4515(1)(e).)

During the bench trial on June 26 and 28, 2012, the Court heard testimony from

-3-

Ashley and Barry.  The parties submitted a stipulation of facts in lieu of Helen's

testimony.  (Doc. 24.)  The parties stipulated to the admission of a number of exhibits at

trial, including but not limited to the following (as identified by exhibit number):

    3.     Greenberg Properties' Operating Agreement;

    9.     A January 10, 2010 letter from Greenberg Properties' accountant to Ashley's attorney in a previous lawsuit;

    10.    The Ashley Greenberg Trust Agreement;

    11.    A September 7, 2005 letter from an attorney representing Ashley seeking information concerning the trust of which she was a beneficiary;

    12.    The arbitrator's decision in the lawsuit Ashley filed against Barry;

    19.    Schedules prepared by Ashley's accounting expert in a previous lawsuit detailing the distributions from Greenberg Properties and the amounts that should have been paid to the Ashley Greenberg Trust pursuant to the Operating Agreement;

    20.    A spreadsheet setting forth the current value of the unpaid distributions.

Following the bench trial, Helen submitted a brief concerning her statute of limitations

and laches defenses (Doc. 26); and Ashley submitted a brief concerning a manager's duty

of care under the Michigan Limited Liability Company Act. (Doc. 27.)  Responses were

filed to each brief.  (Docs. 28, 29.)

**Findings of Fact**

1.      Ashley is Barry's daughter.  Barry is the son of Nathan and Helen Greenberg.

2.      On December 22, 1998, Barry formed the Ashley Greenberg Trust.  (Trial Ex. 10.)

Barry initially was named Trustee.  (*Id*.)  Ashley was appointed Trustee in July 2011.

3.      Prior to May 4, 1999, Helen, as Trustee of the Helen Greenberg Trust, and Barry

formed Greenberg Properties Limited Partnership.  (Trial Ex. 3.)  On May 4, 1999, Helen

and Barry executed an Operating Agreement which converted the partnership to a limited

liability company pursuant to the Michigan Limited Liability Company Act.  (*Id*.)

4.      The Operating Agreement identifies Helen and Barry as Greenberg Properties'

initial managers.  (*Id*. ¶ 4.1.)  With respect to management of the company, Paragraph 4.1

provides in part:

> The management of the Company shall in all respects be the full and
> complete responsibility of the Manager.[3] . . . If more than one Manager has
> been elected, the group shall act by majority vote. . . .
>
> The Managers shall devote to the management of the Company as much
> time as is reasonably necessary for the efficient operation of the Company.

(*Id*.)  Paragraph 4.2 of the Operating Agreement sets forth limitations on the managers'

authority:

> Notwithstanding anything to the contrary contained in this Agreement, the
> manager shall not, without the unanimous written consent of all of the

---

[3]The Operating Agreement states that "[a]ll of the terms and words used in this
Agreement, regardless of the number or gender in which they are used, shall be deemed
and construed to include any other number, singular, or plural, and any other gender . . .."
(Trial Ex. 3 ¶ 10.6.)

Members:

(a)    take any action in contravention of this Agreement;

(b)    take any action that would make it impossible to carry out the
       purposes of the Company; or

(c)    confess a judgment against the Company.

(*Id.* ¶ 4.2.)

5.    On May 14, 1999, Helen, as Trustee of the Helen Greenberg Trust, assigned the

trust's Class B Non-Voting Units in Greenberg Properties as follows:

| | |
|---|---|
| Barry S. Greenberg: | 475 Class B Non-Voting Units |
| Rachel N. Greenberg[4]: | 163.33 Class B Non-Voting Units |
| Ashley L. Greenberg<br>Agreement of Trust-1998: | 163.33 Class B Non-Voting Units |
| Steven Granitz[5]: | 163.33 Class B Non-Voting Units |

(*Id.* Attachment ["Assignment of L.L.C. Membership Units Greenberg Properties,

L.L.C."].)  The Operating Agreement states that profits and losses of Greenberg

Properties "shall be allocated to the Members in direct proportion to the number of Units

owned by each of them."  (*Id.* ¶ 3.1.)  Paragraph 3.2 further provides that "[d]istributions

shall be made . . . subject to the fiduciary requirements of the [Michigan Limited Liability

Company] Act and Michigan law generally." (*Id.* ¶ 3.2.)  Pursuant to these provisions, the

---

[4]Rachel Greenberg is Ashley's sister, Barry's daughter, and Helen's grand-
daughter.

[5]Steven Granitz is Ashley's first cousin, Helen's grandson and Barry's nephew.

Ashley Greenberg Trust is entitled to 16.33% of every distribution authorized by the managers of Greenberg Properties.

6.     Barry made the decision when to issue distributions from Greenberg Properties, to which members the distributions would be made, and the amount of the distributions. Initially, distributions were made in direct proportion to the number of Units owned by each member (i.e., in accordance with the Operating Agreement).  Beginning around February 2003, however, Barry started to make distributions randomly, based on when a member asked him for money and the amount of money the member needed at the time. (Trial Ex. 19 Schedule 9.)

7.     Helen was neither consulted about nor aware of the basis for any distributions from Greenberg Properties. (Doc. 24 ¶ 1.)  Helen did not do anything to manage Greenberg Properties.  (*Id*. ¶ 2.)  She did not discuss the management or affairs of Greenberg Properties with anyone, nor supervise Barry's actions in any manner.  (*Id*. ¶ 3.) Helen did not create, receive, review, or request any information regarding distributions from Greenberg Properties.  (*Id*. ¶ 4.)  She "assumed" Barry was making proper distributions.  (*Id*. ¶ 5.)

8.     At some point in time, Ashley formed the belief that there might be a trust in her grandfather's name of which she was a beneficiary.  After her attempts to obtain information from her father concerning her interest in the trust proved unsuccessful, Ashley had a lawyer contact her father.  (*See* Trial Ex. 11.)  Barry referred Ashley's lawyer, Ian Pesses, to Robert Schwartz at Raymond & Prokop, P.C. in Southfield,

-7-

Michigan.  (*See id.*)  On September 7, 2005, Attorney Pesses sent Attorney Schwartz a letter requesting certain information related to "the Trust of which [Ashley] is a beneficiary."  (*Id.*)  Ashley testified that she and Attorney Pesses were seeking information concerning her grandfather's trust, as this was the only trust of which she was aware at that time.

9.      In 2008, Ashley filed a petition in the Probate Court for Oakland County, Michigan, in which she sought an accounting of the Nathan Greenberg Trust and alleged that the trustees of the Nathan Greenberg Trust had breached their fiduciary duty to account for the trust funds ("Nathan Greenberg Trust litigation").  *See In re Nathan Greenberg Trust*, No. 292511, 2010 WL 4137461, at *1 (Mich. Ct. App. Oct. 21, 2010) (unpublished opinion).  Early in the case, the respondents filed a motion for summary disposition which the probate court granted on March 31, 2009, after finding that there were no remaining assets of the trust to be distributed to the beneficiaries.  The court interpreted the Nathan Greenberg Trust Agreement as providing for the distribution of Nathan Greenberg's estate into two separate shares: a family portion and a marital portion.  (*Id.* at 2.)  The probate court further interpreted the trust agreement as requiring the distribution of specific assets of the family portion first to Barry and determined that, once the distribution to Barry had been made, there were no further assets to be distributed to the remaining beneficiaries of the family portion.  (*Id.* at 3-4.)  The Michigan Court of Appeals affirmed the probate court's order.  (*Id.*)

10.     At the end of 2005 or beginning of 2006, during the Nathan Greenberg Trust

litigation, Ashley requested and received "trust" documents. These documents included the Ashley Greenberg Trust Agreement. This agreement informed Ashley for the first time that there was a trust in her name. The Ashley Greenberg Trust Agreement reflects that the trust's assets were $10.00. (Trial Ex. 10 Sch. A.) On May 22, 2009, Ashley sued Barry in the Circuit Court for Oakland County, Michigan, concerning his administration of the Ashley Greenberg Trust and to determine whether the trust had any further assets ("Ashley Greenberg Trust litigation").

11.     During the Ashley Greenberg Trust litigation, Ashley received financial documentation reflecting monies the trust received and expenses paid from the trust's assets. This documentation reflected distributions to the Ashley Greenberg Trust from Greenberg Properties. Ashley testified that this was the first time she became aware of Greenberg Properties. Although distributions from Greenberg Properties were deposited in the bank account for the Ashley Greenberg Trust, Ashley testified that she never saw the bank statements for the trust which were sent to Barry, who was then the trustee. According to Ashley, she had no access to the Ashley Greenberg Trust bank account and in fact did not even know it existed. Barry endorsed the checks made payable to the trust. Payments made by Barry on Ashley's behalf from the trust account were made directly by him. When Barry sent funds to Ashley directly, he wrote a check to Ashley from the Ashley Greenberg Trust bank account, endorsed the check himself, deposited the funds into his bank account or Ashley's personal bank account, and then sent the funds to Ashley from those accounts.

12.     On December 30, 2009 and January 12, 2010, in the Ashley Greenberg Trust

litigation and after discovering the payments to the trust from Greenberg Properties,

Ashley served the accountant for Greenberg Properties, Ed Rosenbaum, with subpoenas

requesting various documents for the limited liability corporation.  (Trial Ex. 9.)  On

January 18, 2010, Rosenbaum responded to the request and delivered to Ashley's

attorney, *inter alia*: (1) all tax returns for Greenberg Services, LLC for 1998 and 1999;

(2) all tax returns for Greenberg Properties LP or Greenberg Properties LLC for the

period 1998-2008; (3) broker statements for Greenberg Properties LLC for 2009; and (4)

operating agreements for Greenberg Services, LLC, Greenberg Properties, LP, and

Greenberg Properties, LLC.  (*Id.*)

13.     Ashley discovered the Ashley Greenberg Trust's interest in Greenberg Properties

as a result of her review of these documents.  The documents also alerted Ashley that any

distributions from Greenberg Properties to its members were required to be in direct

proportion to the number of Units they owned and that Barry, as the corporation's

manager, had not made distributions proportionately.[6]

---

[6]At trial, and for the first time in this litigation, Defendant's attorney initially
argued and attempted to show that the distributions did not need to be made in proportion
to membership.  Defense counsel contended that the distributions were "cash
distributions" governed by paragraph 3.2 of the Operating Agreement, only– which
allows for distributions "at the time, in the amount, and to the recipients designated by the
Manager . . . subject to the fiduciary requirements of the [LLCA] and Michigan law
generally" (Trial Ex. 3)– as opposed to "allocations of profits and losses" governed by
paragraph 3.1.  Defense counsel abandoned this argument as the trial proceeded.  In any
event, Defendant previously waived this argument, having stipulated in the final pretrial

(continued...)

14.     At the end of the Ashley Greenberg Trust litigation, an arbitrator found

$140,176.00 in distributions that should have been paid from Greenberg Properties to the

trust, but were not.  (Trial Ex. 12 at 15.)  The arbitrator awarded the Ashley Greenberg

Trust those funds from Barry.  (*Id*.)  That amount, as well as other damages the arbitrator

awarded Ashley, were converted to an April 4, 2011 Judgment against Barry totaling

$611,237.81.  (Trial Ex. 21.)

15.     Despite her efforts to collect on the Judgment against Barry, Ashley has recovered

only $12,000 of the total award.

16.     After the Ashley Greenberg Trust litigation concluded, Ashley asked Barry to step

down as the trustee of her trust.  He refused.  Ashley therefore had to file a separate

lawsuit in Michigan Probate Court to remove Barry as the trustee and have a new trustee

appointed.  The probate judge ultimately removed Barry and appointed Ashley as the

trustee of the Ashley Greenberg Trust in July 2011.

17.     The distributions due to the Ashley Greenberg Trust from Greenberg Properties

during the period from May 1, 2005 through June 1, 2009, have a current value of

$59.391.28.[7]  (Trial Ex. 20.)

---

[6](...continued)
order to the fact that "[t]he Operating Agreement requires that *all* distributions from the
company shall be made by the Managers to the company's members . . . 'in direct
proportion to the number of units owned by each' member."  (Doc. 25 at 6 ¶ 9.)

[7]In total, $200,102.16 in distributions should have been made to the Ashley
Greenberg Trust from Greenberg Properties (*see* Trial Ex. 19 Sched. 9); however, this
accounts for distributions that were made beyond the maximum (i.e. 6 years) statute of
(continued...)

## Conclusions of Law

### Statutes of Limitations and Laches Issues

As set forth earlier, Plaintiff asserts breach of contract and Michigan Limited Liability Company Act claims against Defendant. The limitations period applicable to Plaintiff's breach of contract claim is six years. *See* Mich. Comp. Laws § 600.5807(8). The applicable limitations period under the Michigan Limited Liability Company Act is three years after the cause of action has accrued or within 2 years after the cause of action is discovered or should reasonably have been discovered, whichever occurs first. *Id*. §§ 450.4404(6), .4515(1)(e). Defendant argues that Plaintiff's breach of contract claim in fact is a breach of fiduciary duty claim and thus the Michigan Limited Liability Company Act's shorter limitations period governs this action. Defendant further argues that Plaintiff's claims should be barred by the laches doctrine, because she did not exercise due diligence in discovering the Ashley Greenberg Trust or the assets to which the trust was entitled.

Under Michigan law, to decide which limitation period controls, courts examine the type of conduct at issue and the interest harmed, rather than the label the plaintiff chooses for his or her claim. *See Winterhalter v. Watson Wyatt & Co.*, 87 F. App'x 513, 516 (6th Cir. 2004) (unpublished opinion) (citing *Local 1064, RWDSU AFL-CIO v. Ernst & Young*, 449 Mich. 322, 332 n.10, 535 N.W.2d 187, 189 n.10 (1995) ("It is well

---

[7](...continued)
limitations applicable to Plaintiff's current action.

-12-

accepted that in ruling on a statute of limitations defense the court may look behind the technical label that [the] plaintiff attaches to a cause of action to the substance of the claim asserted.")).  Defendant argues that Plaintiff's breach of contract claim essentially is a breach of fiduciary duty claim and thus is more properly controlled by the Michigan Limited Liability Company Act limitations period.  This Court does not agree.

While Plaintiff is alleging that Defendant breached her fiduciary duties, Plaintiff also is alleging that Defendant breached specific duties imposed upon her by Greenberg Properties' Operating Agreement.  In some instances, Defendant's alleged breach of her contractual duties also constitutes a breach of her fiduciary duties.  Nevertheless, Defendant cites no authority to find that Plaintiff cannot assert breach of contract *and* breach of fiduciary claims in that instance.  This is not the holding or suggestion in the cases Defendant cites in the supplemental brief filed after the bench trial.  Thus if Plaintiff has established the elements of her breach of contract claim, the Court concludes that she can recover damages incurred from that breach in the six years before she filed this lawsuit.  *See* Mich. Comp. Laws § 600.5807(8).

A party asserting laches must prove: (1) the plaintiff's lack of diligence and (2) prejudice to the defendant.  *Regents of the Univ. of Mich. v. State Farm Mut. Ins. Co.*, 250 Mich. App. 719, 734, 650 N.W.2d 129, 137 (2002) (citing *Jackson v. Thompson-McCully Co.*, 239 Mich. App. 482, 494, 608 N.W.2d 531 (2000)).  Defendant argues that Plaintiff was aware of the Ashley Greenberg Trust in 1998, or at least 2005 or 2006, but took no action to uncover its interests until much later and after Greenberg Properties had no

-13-

assets to pay her claimed unpaid distributions.  Based on the evidence presented at trial, this Court is not convinced that Plaintiff knew about the Ashley Greenberg Trust prior to 2005 or 2006 and believes that she exercised due diligence after learning about the trust to determine its assets and interests.

First, as to when Plaintiff became aware of the Ashley Greenberg Trust, the Court found her testimony on this issue more credible than Barry's testimony and therefore does not accept his assertion that he told his daughter about the trust as far back as 1998. Barry was not able to recall any specifics about what he told Ashley about her trust, when he told her, or how he told her.  Barry's version was further undermined by testimony concerning how he paid funds into and from the Ashley Greenberg Trust bank account– a manner which suggested that he in fact was attempting to hide the existence of the trust from Ashley.  While cross-examining Ashley, defense counsel pointed out that in the Ashley Greenberg Trust litigation, the arbitrator noted in his decision that Ashley became aware of the trust in 1998, when she was eighteen years old.  (*See* Trial Ex. 12 at 6.) However, three pages later in his decision, the arbitrator also wrote that Ashley found out about the Ashley Greenberg Trust in 2006.

As to Ashley's diligence in seeking information concerning the Ashley Greenberg Trust, the record reflects that she sought information from Barry directly for some time after learning about the trust and filed the Ashley Greenberg Trust litigation when those efforts proved fruitless.  The record further reflects that even after the litigation began, it took substantial efforts to eventually obtain financial information concerning the

-14-

trust–which only then informed Ashley of the trust's interest in Greenberg Properties.  It took further efforts to obtain information about Greenberg Properties.

The Court therefore rejects Defendant's laches argument.

### Breach of Contract

Under Michigan law, a plaintiff asserting a breach of contract claim must show (1) the existence of a valid contract between the parties, (2) that the terms of the contract required the defendant's performance of certain actions, (3) the defendant breached the contract, and (4) the breach caused the plaintiff injury.  *Keiper, LLC v. Intier Auto., Inc.*, 467 F. App'x 452, 459 (6th Cir. 2012) (citing *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003)).  Pursuant to the Michigan Limited Liability Corporation Act, an "operating agreement" is a written agreement between the members of a limited liability company "pertaining to the affairs of the company and the conduct of its business."  Mich. Comp. Laws § 450.4102(r).  In addition to being a member of Greenberg Properties, Helen Greenberg is a signatory to its Operating Agreement.[8]  The Ashley Greenberg Trust, as a member of the limited liability corporation, also is a party to the agreement.

The Operating Agreement requires managers to "devote to the management of the Company as much time as is reasonably necessary for the efficient operation of the Company" and to act "by majority vote."  (Trial Ex. 3 ¶ 4.1.)  Managers are required as

---

[8]During the bench trial, defense counsel repeatedly pointed out Helen Greenberg's current age, 94.  The Court notes, however, that when she signed the Operating Agreement in 1999, Helen only was 81 years of age.

well to "do any and all things necessary or appropriate to accomplish the purposes of the Company *subject to the provisions of th[e] Agreement*." (*Id.* ¶ 4.3.) The Operating Agreement further requires managers to allocate distributions to members in direct proportion to their ownership interests and subject to the fiduciary requirements of the Michigan Limited Liability Company Act and Michigan law, generally. (*Id.* ¶¶ 3.1, 3.2.) Defendant breached these duties.

As the parties have stipulated, Defendant "did not do anything to manage Greenberg Properties." (Doc. 24 ¶ 2.) She did not discuss the management or affairs of the limited liability corporation with anyone or supervise her co-manager's actions in any manner. (*Id.* ¶ 3.) She "did not create, receive, review or request any information regarding distributions from Greenberg Properties." (*Id.* ¶ 4.) She thus failed to devote the time or attention to the limited liability corporation to assure that it was being operated in accordance with the Operating Agreement's terms, specifically the terms requiring allocations on a *pro rata* basis.

Had Defendant performed her duties under the agreement, distributions and other managerial acts would not have been made without her consent. (*See* Trial Ex. 2 ¶ 4.1.) In this respect, the Court finds this case distinguishable from *Allied Freightways, Inc. v. Cholfin*, 91 N.E.2d 765 (Mass 1950), cited by Defendant. In *Allied Freightways*, the Massachusetts Supreme Court declined to impose liability on the defendant, a nominal director of a corporation, for the corporate funds wrongfully distributed by her husband, another director, for their personal use. The court found it unlikely that the defendant,

Isadore Cholfin, could have uncovered the improper payments from the corporation's bookkeeping records (which were found to be "not well kept") and/or prevented the improper disbursements of funds that were the subject of the lawsuit. *Id.* at 768.  Unlike Mrs. Cholfin, Helen Greenberg had the authority to change the manner in which her son made distributions from Greenberg Properties had she been diligent in exercising her managerial duties.  Further, unlike the corporation in *Allied Freightways*, Greenberg Properties' financial records were neither in disorder nor complex.  Greenberg Properties' sole purpose was to hold and distribute its assets, all of which were held in and distributed from a Merrill Lynch account. Thus information concerning the distributions– particularly that they were not made on a *pro rata* basis– should have been easily discernible from the Merrill Lynch account monthly statements.  Even a housewife with no business experience– as Defendant portrayed herself– should be able to read and understand such statements.

On the causation issue, the Michigan Supreme Court has acknowledged that "it is not always possible to measure in dollars the losses which a negligent director could have avoided if he had been attentive to his duties."  *Martin v. Hardy*, 251 Mich. 413, 419, 232 N.W. 197, 199 (1930).  However, quoting *Barnes v. Andrews*, 298 F. 614 (S.D.N.Y. 1924), the Michigan Supreme Court recognized that there are some instances where causation between a director's nonfeasance and a plaintiff's damages can be established. As Judge Learned Hand explained in *Barnes*, a different outcome arises with respect to the causation issue where damages are sought for specific wrongful payments as opposed

-17-

to general mismanagement of a business:

> When the corporate funds have been illegally lent, it is a fair inference that
> a protest would have stopped the loan, and that the director's neglect caused
> the loss. But when a business fails from general mismanagement, business
> incapacity, or bad judgment, how is it possible to say that a single director
> could have made the company successful, or how much in dollars he could
> have saved?

298 F. at 616-17 (citing cases where a manager's or director's negligence was found to
have caused a specific loss).

Particularly instructive in the present case is the Supreme Court of New Jersey's

decision in *Francis v. United Jersey Bank*, 432 A.2d 814 (N.J. 1981). *Francis* concerned

the liability of Lillian Pritchard, based on her role as a director of a corporation from

which her sons– who also were directors–  had misappropriated funds (thus driving the

corporation into bankruptcy).[9]  Mrs. Pritchard was neither active in the family business

nor knowledgeable about its corporate affairs, and the testimony presented at trial was

that she "was old, was grief-stricken at the loss of her husband, sometimes consumed too

much alcohol and was psychologically overborne by her sons."  *Id*. at 819-20.  The New

Jersey Supreme Court nevertheless found her liable for the losses perpetrated by her sons,

concluding that her negligent omissions as a director were "a necessary antecedent to

the[ir] defalcations."  *Id*. at 828.

On the issue of causation, the court advised: "Analysis in cases of negligent

---

[9]Mrs. Pritchard died after institution of the lawsuit and thus her estate was
substituted as a defendant.  *Francis*, 432 A.2d at 816.

-18-

omissions calls for determination of the reasonable steps a director should have taken and whether that course of action would have averted the loss." *Id*. at 826.  The court acknowledged that "[c]ases involving nonfeasance present a much more difficult causation question than those in which the director has committed an affirmative act of negligence leading to the loss" and cited several cases where courts found that the plaintiffs failed to prove "that diligent execution of the directors' duties would have precluded the losses." *Id*. at 826, 827-28 (citing cases).  However, the court also cited numerous cases where courts found a link between a director's nonfeasance or omissions and specific losses to the corporation. *Id*. at 828 (citing cases).  As to Mrs. Pritchard, the court concluded:

> Within Pritchard & Baird [the corporation], several factors contributed to the loss of the funds: comingling [sic] of corporate and client monies, conversion of funds by Charles, Jr. and William [the defendant's sons] and dereliction of her duties by Mrs. Pritchard.  The wrongdoing of her sons, although the immediate cause of the loss, should not excuse Mrs. Pritchard from her negligence which also was a substantial factor contributing to the loss.  Restatement (Second) of Torts, supra, § 442B, comment b.  Her sons knew that she, the only other director, was not reviewing their conduct; they spawned their fraud in the backwater of her neglect.  Her neglect of duty contributed to the climate of corruption; her failure to act contributed to the continuation of that corruption.  Consequently, her conduct was a substantial factor contributing to the loss.

*Id*. at 829.

Similarly, in the present case, the Court believes that Defendant's failure to fulfill her contractual duties as a manger of Greenberg Properties enabled Barry to make distributions from the corporation according to his whim rather than the dictates of the

-19-

Operating Agreement.  Thus this Court concludes that Defendant's breach of the Operating Agreement caused damages to the Ashley Greenberg Trust in that the trust did not receive a *pro rata* share of the distributions made.  The current value of the distributions the Ashley Greenberg Trust should have received for the six years preceding the filing of this lawsuit is $59.391.28.

## Breach of Fiduciary Duties

The Michigan Limited Liability Act also imposes duties upon managers of a limited liability corporation.  Specifically, the Act provides that "a manager shall discharge the duties of manager in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in a manner the manager reasonably believes to be in the interests of the limited liability company."  Mich. Comp. Laws § 450.4404(1).  In discharging such fiduciary duties, the statute allows a manager to "rely on information, opinions, reports, or statements, including, but not limited to, financial statements or other financial data, if prepared or presented by . . . [o]ne or more other managers or members or employees of the limited liability company whom the manager reasonably believes to be reliable and competent in the matter presented."  *Id*. § 450.4404(2)(a).  It is this latter provision on which Defendant relies for her defense to Plaintiff's claims under the Act.

Defendant argues that she is 94 years old, in declining health, essentially confined to her apartment, and has never been involved in business.  (Doc. 28 at 1.)  She asserts that she relied on her son, Barry, to manage her personal finances, as well as those of the

family business after her husband died in 1992.  (*Id.*)  Defendant trusted her son and his

extensive experience handling financial matters.  (*Id*. at 1-2.)

There is a dearth of authority interpreting the Michigan Limited Liability

Company Act, particularly section 440.4504.  However, the Michigan Business

Corporation Act contains identical provisions with respect to the duty of care imposed

upon directors of Michigan corporations.  *See* Mich. Comp. Laws § 450.1541a.  Thus the

Court can look to cases interpreting the Michigan Business Corporation Act to interpret

the fiduciary duty a manager owes to a limited liability company and whether a breach of

that duty can be excused by the manager's reliance on a third party.  *See Duray Dev., LLC*

*v. Perrin*, 288 Mich. App. 143, 158-59, 792 N.W.2d 749, 759 (2010) (citing *McNeil v.*

*Charlevoix Co.*, 275 Mich. App. 686, 701, 741 N.W.2d 27 (2007); *State Treasurer v.*

*Schuster*, 456 Mich. 408, 417, 572 N.W.2d 628 (1998)).  Because both Michigan statutes

are based primarily on their respective model acts, in the absence of controlling precedent

this Court also can look to opinions interpreting statutes in other states that have adopted

the model acts, such as Delaware.  *See, e.g., Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656,

674 n.16 (6th Cir. 2004); *Estate of Detwiler v. Offenbecher*, 728 F. Supp. 103, 147 n.17

(S.D.N.Y. 1989) (citing *Russ v. Federal Mogul Corp.*, 112 Mich. App. 449, 316 N.W.2d

454, 457 n.1 (1982)).

The Michigan Supreme Court has described a director's fiduciary duties as

follows:

Directors must answer for ordinary neglect; and ordinary neglect is

> understood to be the omission of that care which every man of common
> prudence takes of his own concerns. . . . The plain and obvious rule is that
> directors impliedly undertake to use as much diligence and care as the
> proper performance of the duties of their office requires.

*Martin*, 251 Mich. at 416, 232 N.W. at 197-98.  In the case before the *Martin* Court, the

directors "were outstanding business men" who nevertheless had no familiarity with

management of the business in question.  *Id*. at 416-17, 232 N.W. at 198.  They

committed the management of the business to the majority stock owner, George Drach,

"who was well experienced in the business, and in whose ability and integrity they were

justified in placing unlimited confidence."  *Id*. at 417, 232 N.W. at 198.  The Michigan

Supreme Court explained that this nevertheless did not absolve the remaining directors of

their fiduciary responsibilities:

> *It was still their duty to exercise a general supervision over his [Drach's]
> management*.  As to their duty in this respect, the rule is well stated in
> [*Bynum v. Scott*, 217 F. 122, 124 (E.D.N.C. 1914)], as follows: "With
> respect to the duty of the directors of a . . . corporation . . . it would seem
> that, if they exercised due care in the selection and employment of agents
> and managers, *and* thereafter *exercised due care in overlooking and
> supervising* such agents or employees, they are not liable for mistakes of
> judgment, or the wrong doing [sic] of such agents. . . ."

*Id*. (emphasis added); *see also Mason v. Vogue Knitting Corp.*, 361 Mich. 481, 488, 105

N.W.2d 412, 415 (1960) (restating *Martin* in response to the defendant's testimony "that

he left the responsibility of directing the [corporation's] sales campaign to [someone

else].").

As a result, in *Martin*, the Michigan Supreme Court held that the directors who

"acted in the strictest good faith and used reasonable business diligence under the

circumstances in their supervision of the corporate affairs" were not liable for Drach's "reckless management" which caused the corporation large losses.  *Id.* at 419, 232 N.W. at 198.  However, the Court reached a different result with respect to one director who "was in all respects wholly inattentive to the affairs of the company."  *Id.*, 232 N.W. at 198-99.  The Court explained that "[h]aving accepted a position on the board, it was [this director's] duty to attend the meetings and assist his associates in supervising the business" and because "[h]e gave no attention to the business . . . [h]e should be held personally liable for any losses which are shown to have resulted from his inattention to the business."  *Id.*

Even in *Allied Freightways*– the case Defendant cites in her response to Plaintiff's post-trial brief on a manager's duty of care– the Supreme Judicial Court of Massachusetts recognized that "[a] director of a corporation cannot avoid liability for losses sustained by the wrongful conduct of corporate officers by showing that he had abandoned his duties as director or that his ignorance of such conduct was due to what amounted to wilful neglect of his duties."  91 N.E.2d at 768 (citing cases).  As this Court reads the caselaw, this means that while a manager may rely on information provided by a reliable and competent co-manager, the manager may not wholly abdicate his or her fiduciary duties to the other manager.  In other words, a manager retains a fiduciary duty to oversee the affairs of the corporation, even if the manager fulfills that duty by reviewing information prepared and/or provided by another manager who is reliable and competent in the matter presented.  *See In re Caremark Int'l, Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del.

-23-

1996) (holding that directors breach their fiduciary duties as a result of a "sustained or systematic failure . . . to exercise oversight"); *see also Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (recognizing that a director breaches his or her fiduciary duties by "fail[ing] to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities . . .."). As the Delaware Supreme Court advised elsewhere in *Caremark*, to fulfill their fiduciary duties, directors must

> assur[e] themselves that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.

*Id*. at 970.

The New Jersey Supreme Court's discussion of a director's duties in *Francis* as relevant to Mrs. Pritchard's lack of knowledge of and attention to the corporation's affairs are appropriately restated with respect to the present case:

> As a general rule, a director should acquire at least a rudimentary understanding of the business of the corporation . . . Because directors are bound to exercise ordinary care, they cannot set up as a defense lack of the knowledge needed to exercise the requisite degree of care. If one feels that he has not had sufficient business experience to qualify him to perform the duties of a director, he should either acquire the knowledge by inquiry, or refuse to act.
>
> . . .
>
> . . . Directors may not shut their eyes to corporate misconduct and then claim that because they did not see the misconduct, they did not have a duty to look. The sentinel asleep at his post contributes nothing to the enterprise he is charged to protect.

-24-

432 A.2d at 821-22 (internal quotation marks and citations omitted).  As the *Francis* court went on to state: "A director is not an ornament, but an essential component of corporate governance.  Consequently, a director cannot protect himself behind a paper shield bearing the motto, 'dummy director.'"  *Id*. at 823; *see also Bar v. Wackman*, 329 N.E.2d 180, 188 (N.Y. 1975) ("reiterat[ing] the long-standing rule that [a director] does not exempt himself from liability by failing to do more than passively rubber- stamp the decisions of the active managers.")

Defendant consented to her appointment as a manager of Greenberg Properties, despite her age and asserted lack of business experience.[10]  In doing so, she took on the fiduciary duties that the position requires.  These duties did not require Defendant to necessarily be engaged in the day-to-day activities of Greenberg Properties, *see Francis*, 432 A.2d at 822, and she could delegate responsibilities to and rely upon information provided by certain other individuals who were "reliable and competent." *See* Mich. Comp. Laws § 450.4404(2).  However, Defendant could not delegate her duty of care which required her to keep informed about and oversee the limited liability corporation's

---

[10]Defendant signed the Operating Agreement which named her as a manager of Greenberg Properties.  "[T]he law is clear that one who signs an agreement, in the absence of coercion, mistake, or fraud, is presumed to know the nature of the document and to understand its contents, even if he or she has not read the agreement." *Lease Acceptance Corp v. Adams*, 272 Mich. App 209, 221, 724 N.W.2d 724 (2006). The Court notes again that Defendant was thirteen years younger when she assumed the role of manager.  If she subsequently felt that her age rendered her incapable of serving her duties in that role, she should have stepped down or requested removal from the position.

affairs.  Defendant concedes that she did not fulfill this duty.  Instead, she served as a manager in name only.

For the reasons discussed with respect to Plaintiff's breach of contract claim, the Court also concludes that Defendant's breach of her fiduciary duties caused damages to the Ashley Greenberg Trust.[11]

### Conclusion

In short, the Court finds by a preponderance of the evidence that Defendant breached the Greenberg Properties' Operating Agreement and her fiduciary duties under the Michigan Limited Liability Corporation Act.  These breaches caused damage to the Ashley Greenberg Trust, in that the trust did not receive certain distributions to which it was entitled.  For the six years preceding Plaintiff's filing of this lawsuit, these damages totaled $59.391.28, as valued on the date she filed suit.  Judgment therefore will be entered in favor of Plaintiff against Defendant in the amount of $59,391.28.[12]

Dated: August 29, 2012                              s/PATRICK J. DUGGAN
                                                    UNITED STATES DISTRICT JUDGE

---

[11]As discussed earlier, the Michigan Limited Liability Corporation Act precludes Plaintiff from recovering damages on her claims under the act that were incurred more than two or three years before she filed her lawsuit.  However, because the Court concludes that Plaintiff also prevails on her breach of contract claim– for which a six years' statute of limitations applies– it finds it unnecessary to determine the damages to which she is entitled under her statutory claims, alone.

[12]The Court does not believe that this award should be reduced by the amount Ashley has been able to recover from Barry on her state court judgment against him.  That judgment notably included additional damages, unrelated to the improper distributions.

-26-

Copies to:
Paul P. Asker, Esq.
Jessica Dopierala Hite, Esq.
Matthew P. Salgat, Esq.
William H. Horton, Esq.
Paula Johnson-Bacon, Esq.
Elizabeth A. Favaro, Esq.